Matthew D. Brinckerhoff (NY Bar # 2415537)*
Jonathan S. Abady (NY Bar # 2415222)*
Zoe Salzman (NY Bar # 4663308)*
Nick Bourland (NY Bar # 5576129)*
EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000
mbrinckerhoff@ecbawm.com
jabady@ecbawm.com
zsalzman@ecbawm.com
nbourland@ecbawm.com

[Additional counsel cont. on next page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota; Arizona Coalition for Change; and Ulises Ventura,<br><br>Plaintiffs,<br><br>v.<br><br>Katie Hobbs, in her official capacity as Arizona Secretary of State,<br><br>Defendant. | No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Mary R. O'Grady (AZ Bar #011434)
Joshua D. Bendor (AZ Bar # 031908)
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012-2793
(602) 640-9000
mogrady@omlaw.com
jbendor@omlaw.com

John Bonifaz (MA Bar # 562478)**
Gillian Cassell-Stiga (NY Bar # 5069877)**
Ben Clements (MA Bar # 555082)**
Ronald Fein (MA Bar # 657930)**
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, Massachusetts 02459
(617) 249-3015
jbonifaz@freespeechforpeople.org
gillian@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org

* *Admitted Pro Hac Vice*
** *Pro Hac Vice Applications to be filed*

*Attorneys for Plaintiffs*

**PRELIMINARY STATEMENT**

1. This action is brought to protect Plaintiffs who are engaged in voter registration work fundamental to our democracy, and to ensure that all Arizonans who want to register to vote in this year's Presidential election will have the time necessary to do so, notwithstanding the COVID-19 pandemic.

2. Arizona law requires that all voters submit their registration to vote no later than 29 days before the election.

3. That means that any Arizonan who wishes to vote in this year's Presidential election on November 3, 2020, must register no later than Monday, October 5, 2020 (the "Voter Registration Cutoff") or lose the right to vote.

4. But this is no ordinary year. This year, Arizona, like the rest of the country and world, is grappling with the devastating and enduring effects of the COVID-19 pandemic which has killed over 200,000 Americans.

5. Plaintiffs Mi Familia Vota and Arizona Coalition for Change are not-for-profit organizations working to register voters ahead of the November election. Plaintiff Ulises Ventura is a voter registration organizer employed by Mi Familia Vota.

6. From March 30, 2020, when Arizona imposed a stay-at-home order and other restrictions on day-to-day interactions in order to mitigate the effects of the pandemic, to the middle of August when those restrictions were lifted, Plaintiffs were effectively prevented from registering voters.

7. The act of registering people to vote through voter registration drives and get-out-the-vote campaigning implicates core political speech and associational rights protected by the First and Fourteenth Amendments.

8. Plaintiffs have diverted significant resources to try to register as many voters as possible ahead of the Voter Registration Cutoff notwithstanding the pandemic conditions, but unless the Voter Registration Cutoff is extended, Plaintiffs will not be able to complete their work and thousands of eligible voters will not be registered and will not be able to vote in the election.

9. Defendant Secretary of State's enforcement of the Voter Registration Cutoff as applied under the pandemic conditions, which have prevailed in Arizona since March 2020, severely burdens Plaintiffs' right to register voters for the election, in violation of Plaintiffs' constitutional rights enshrined in the First and Fourteenth Amendments.

10. Plaintiffs bring this case seeking a declaration that the Voter Registration Cutoff is unconstitutional as applied, and a temporary restraining order and preliminary injunction to immediately enjoin Defendant Secretary of State from enforcing the Voter Registration Cutoff this year and directing her to extend it so that thousands more eligible voters can be registered to vote this year.

**JURISDICTION AND VENUE**

11. Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of their rights under the First and Fourteenth Amendments to the U.S. Constitution.

12. This Court has jurisdiction under Article III, § 2 of the United States Constitution, and pursuant to 28 U.S.C. §§ 1331, 1343, and 1357.

13. This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

14. Venue in this district is proper under 28 U.S.C. § 1391 because the Defendant resides in this District and a substantial part of the events or omissions giving rise to this claim occurred in this District.

**PARTIES**

15. Plaintiff Mi Familia Vota ("MFV") is a national, non-profit civic engagement organization with the mission of uniting Latino, immigrant, and allied communities to promote social and economic justice through citizenship workshops, voter registration, and voter engagement. MFV encourages voter registration and participation, and has challenged voter suppression around the nation. It has operations in six states, including Arizona. MFV has had to divert money, personnel, time, and

resources away from its planned activities due to the conduct alleged here. Specifically, MFV has had to divert and spend additional money, time, and other resources it would not otherwise have spent to register voters ahead of the Voter Registration Cutoff because Defendant has not extended the Voter Registration Cutoff. Defendant's enforcement of the Voter Registration Cutoff under these conditions has frustrated MFV's fundamental mission of registering as many voters as possible with the specific target of registering 30,000 voters in 2020. Defendant's enforcement of the Voter Registration Cutoff under these conditions severely burdens MFV's ability to engage in constitutionally protected political speech and associational rights through its voter registration efforts.

16. Plaintiff Arizona Coalition for Change ("ACFC") is a non-profit organization with a mission to empower everyday people to transform their community by building civic power, just and equitable schools, and safer neighborhoods. ACFC's civic engagement team's primary mission is to register people to vote. Plaintiff ACFC has had to divert money, personnel, time, and resources away from its planned activities due to the conduct alleged here. Specifically, ACFC has had to divert and spend additional money, time, and other resources it would not otherwise have spent to register voters ahead of the Voter Registration Cutoff because Defendant has not extended the Voter Registration Cutoff. Defendant's enforcement of the Voter Registration Cutoff under these conditions has frustrated ACFC's fundamental mission of registering as many voters as possible with the specific target of registering 25,000 voters in 2020. Defendant's enforcement of the Voter Registration Cutoff under these conditions severely burdens the Coalition's ability to engage in constitutionally protected political speech and associational rights through its voter registration efforts.

17. Plaintiff Ulises Ventura is a resident of Phoenix, Arizona and engages in voter registration work there and in Tucson, Arizona in his capacity as an employee of Mi Familia Vota.

18. Defendant Katie Hobbs is the Arizona Secretary of State. Defendant Secretary Hobbs is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law. As Secretary of State, Secretary Hobbs is Arizona's chief election officer. She is an elected officer and is responsible for overseeing and administering elections in Arizona. Ariz. Con. Art. V; Ariz. Rev. Stat. § 16-142(A). Secretary Hobbs has the authority to promulgate rules and procedures for elections, such as voter registration. *See* Ariz. Rev. Stat. §§ 16-452(A) & 16-168(J). To date, however, Secretary Hobbs has not extended the Voter Registration Cutoff. Secretary Hobbs is sued in her official capacity.

**FACTS**

*Arizona's Voter Registration Cutoff*

19. Arizona law requires voters to register to vote 29 days before an election to be able to vote in that election.

20. Specifically: "An elector shall not vote in an election called pursuant to the laws of this state unless the elector has been registered to vote as a resident within the boundaries or the proposed boundaries of the election district for which the election is being conducted and the registration has been received by the county recorder or the recorder's designee pursuant to § 16-134 before midnight of the twenty-ninth day preceding the date of the election." Ariz. Rev. Stat. Ann. § 16-120.

21. Arizona law further provides that a registration received by the county recorder through the mail is timely if it was "postmarked twenty-nine days or more before an election," or "dated twenty-nine days or more before an election and is received by the county recorder by first class mail within five days after the last day to register to vote." Ariz. Rev. Stat. Ann. §§ 16-134(C)(1)–(2).

22. Thus, whether a citizen registers to vote in person, by mail, or otherwise, the registration form must be completed and submitted by twenty-nine days before the election.

23. This year, election day is Tuesday, November 3, 2020.

24. That means that, in order to be able to vote in this year's election, Arizonans must submit their registration to vote no later than Monday, October 5, 2020 (the "Voter Registration Cutoff").

25. Plaintiffs MFV and ACFC are not-for-profit organizations which engage in voter registration work.

26. Plaintiff Ulises Ventura helps voters complete their registration and is employed as a voter registration organizer by MFV.

27. In 2020, both organizational Plaintiffs joined a coalition of organizers dedicated to registering 250,000 new voters for the 2020 election.

28. Plaintiff MFV had a target for its organization of registering 30,000 new voters this year.

29. Prior to March 20, 2020, MFV had registered 9,845 new voters.

30. Prior to March 20, 2020, MFV was on track to register 41,568 voters by October 5 and exceed its target of registering 30,000 new voters.

31. Plaintiff ACFC had a target for its organization of registering 25,000 new voters this year.

32. Prior to March 30, 2020, ACFC had registered 6,662 new voters.

33. Prior to March 30, 2020, ACFC was on track to meet or exceed its target of registering 25,000 new voters before the Voter Registration Cutoff.

**The COVID-19 Pandemic Hits Arizona**

34. Plaintiffs' voter registration work was effectively halted by the impact of the COVID-19 pandemic on Arizona and the Arizona government's response to that crisis.

35. The first known case of community-based transmission of COVID-19 in Arizona was documented on March 6, 2020. Cases then spread rapidly.

36. Since March 6, at least 5,650 people have died of the virus in Arizona and there have been 218,507 confirmed cases.[1]

37. On March 12, 2020, Governor Doug Ducey declared a state of emergency in Arizona due to the pandemic.[2]

38. On March 15, 2020, all schools were closed statewide.[3]

39. On March 17, 2020, the Arizona Department of Health Services issued guidance that included canceling or postponing gatherings of 10 people or more.[4]

40. On March 19, 2020, bars, gyms, and movie theaters were required to close and restaurants were directed to provide dine-out options only.[5]

41. On March 30, 2020, Governor Ducey issued a statewide stay-at-home order which prevented Arizonans from leaving their residences except for food, medicine, and other essential activities. The order also directed all people to maintain physical distancing of at least six feet away from others in shared or outdoor spaces.[6] A violation of the order was a class 1 misdemeanor.[7]

42. On April 8, 2020, the Governor issued an order requiring travelers from "area[s] with substantial community [COVID-19] spread" to isolate and self-quarantine upon arrival in Arizona.[8]

43. On April 29, 2020, the Governor extended the March 30, 2020 stay-at-home order through May 15, 2020 by a similar executive order.[9]

---

[1] See Ariz. Dep't of Health Servs., *Data Dashboard*, https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php (last visited Sept. 30, 2020).
[2] Ariz. Declaration (Mar. 11, 2020), https://azgovernor.gov/sites/default/files/declaraton_0.pdf.
[3] *See* Ariz. Exec. Order No. 2020-18 (Mar. 30, 2020) at 1.
[4] *See id.*
[5] Ariz. Exec. Order No. 2020-09 (Mar. 19, 2020) at 2.
[6] Ariz. Exec. Order No. 2020-18 (Mar. 30, 2020) at 3.
[7] *Id.* at 4 (citing Ariz. Rev. Stat. § 26-317).
[8] Ariz. Exec. Order No. 2020-24 (Apr. 8, 2020) at 2.
[9] *See generally* Ariz. Exec. Order No. 2020-33 (Apr. 29, 2020).

44. Governor Ducey rescinded the stay-at-home order and loosened other COVID-19-related restrictions as of May 12, 2020.[10]

45. Arizonans were still directed to maintain physical distancing from others in public areas and avoid settings where physical distancing was not possible.[11]

46. A surge of new cases in Arizona followed the Governor's attempts to loosen restrictions, with an increase of over 800% in new cases reported between the middle of May and early July.[12]

47. In response, the Governor re-imposed restrictions on large public events and many non-essential businesses through executive orders issued on June 29[13] and July 9, 2020,[14] and continued to extend those restrictions through August 6, 2020 when the orders expired.[15]

48. The number of new cases in Arizona in August and September has been lower than in June and July, but the virus continues to spread throughout the state.

49. On the single day of September 23, 2020, for example, Arizona reported 578 new, documented COVID-19 cases in the state.[16]

---

[10] Ariz. Exec. Order No. 2020-36 (May 12, 2020) at 2 (rescinding Exec. Order Nos. 2020-18, 2020-24, and 2020-33).
[11] *Id.*
[12] Anne Gearan & Jacqueline Dupree, *White House calls Arizona a coronavirus success story as state resets after huge spike in* cases, Wash. Post (Aug. 5, 2020), https://www.washingtonpost.com/politics/white-house-calls-arizona-a-coronavirus-success-story-as-state-resets-after-huge-spike-in-cases/2020/08/05/a76774a0-d74a-11ea-930e-d88518c57dcc_story.html.
[13] Ariz. Exec. Order No. 2020-43 (June 29, 2020) at 2–3.
[14] Ariz. Exec. Order No. 2020-47 (July 9, 2020) at 3.
[15] Ariz. Exec Order No. 2020-52 (July 23, 2020) at 2 (extending Executive Order No. 2020-42).
[16] *See* Ariz. Dep't of Health Servs., *Data Dashboard*, https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php (last visited Sept. 30, 2020) (click "Confirmed COVID-19 Cases by Day").

7

50. Because Arizona has tested only a small percentage of residents for coronavirus infection, it is likely that the true rate of infection and fatalities is higher than reported.

51. Medical experts predict an ongoing, second, or worse wave of COVID-19 infections in the fall and winter of 2020.[17]

***The COVID-19 Pandemic Conditions Severely Curtailed Plaintiffs' Voter Registration Work***

52. Plaintiffs typically do their voter registration work in person, either by going door-to-door, or by holding voter registration events at high-traffic public areas such as churches, schools, community centers, and stores.

53. In response to the pandemic and the Governor's orders, the majority of these high-traffic areas, including schools, churches, and community centers, closed at the end of March 2020 and most remain closed to this day.

54. Even in those high-traffic areas which remained open, such as grocery stores, it was almost impossible for voter registration staffers to register voters while maintaining the physical distancing of at least 6 feet required by the Governor's orders.

55. Similarly, it became almost impossible to do door-to-door registration at potential voters' homes while maintaining the required physical distancing of at least 6 feet.

56. Potential voters as well as Plaintiffs' voter registration organizers were understandably fearful they would catch the virus if they engaged in the close contact required for a voter registration employee to help fill out a voter registration form.

---

[17] *See* Audrey Cher, *WHO's Chief Scientist Says There's a 'Very Real Risk' of a Second Wave of Coronavirus as Economies Reopen*, CNBC (June 9, 2020), https://cnb.cx/2MM8p97; Len Strazewski, *Harvard Epidemiologist: Beware COVID-19's Second Wave This Fall*, American Medical Ass'n (May 8, 2020), https://www.ama-assn.org/delivering-care/public-health/harvard-epidemiologist-beware-covid-19-s-second-wave-fall; Zack Budryk, *CDC Director Warns Second Wave of Coronavirus Might Be 'More Difficult'*, The Hill (Apr. 21, 2020), https://thehill.com/policy/healthcare/493973-cdc-director-warns-second-wave-of-coronavirus-might-be-more-difficult.

57. These fears were well-founded. The COVID-19 virus spreads though respiratory droplets left in the air, sometimes for hours, after an infected person sneezes, coughs, exhales deeply, or speaks. Many people who contract the virus do not exhibit symptoms but can still spread the virus to others. Wearing masks mitigates, but does not eliminate, the risk of contracting the virus and is not a substitute for social distancing of at least 6 feet from other people.[18] The consequences of contracting the virus can be severe and even fatal.[19] To date, the pandemic has killed more than 200,000 Americans.

58. As a result, for five months—from the time Governor Ducey first issued a stay-at-home order on March 30, 2020, until the middle of August when government-imposed restrictions were lifted and the case numbers began to go down—Plaintiffs were effectively prevented from registering voters in person.

59. During this five-month period, Plaintiffs attempted to replicate in-person voter registration with voter registration by phone, text, and online, as well as through drive-through voter registration events.

60. But the number of voters they were able to register was dramatically lower than with in-person voter registration.

61. The Secretary of State's own data confirms that voter registration this year is significantly lower than in 2016, the last Presidential election year. Between January and August 2016, 146,214 new voters registered. In the same period this year, the State processed only 62,565 registrations.

62. Plaintiff MFV, for example, registered 1,523 voters in the single week preceding Governor Ducey's March 30 stay-at-home order.

---

[18] Ctrs. for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Symptoms* (May 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.vo

[19] Ctrs. for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Clinical Care Guidance* (Sept. 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

9

63. But between March 30 and the middle of August, Plaintiff MFV registered on average only 193 voters every week.

64. During the months of April through July, ACFC registered only 710 total new voters.

65. Many potential voters were reluctant to share personal identifying information such as social security numbers over the phone.

66. Many of the potential voters in the communities Plaintiffs serve lack reliable internet access and devices necessary to complete voter registration online.

67. Also, in the midst of this shutdown, Arizona closed its online registration system for four days right before the deadline to register for the spring primary elections.[20]

68. Until September 4, 2020, Arizona's online voter registration system did not allow a voter to register online if they had a non-traditional address, which is common among Native American voters who live on tribal lands.

69. To this day, Arizona's online voter registration system only allows voters to register online if they have State-issued driver's licenses, not other forms of identification such as tribal identification for Native American voters or student identification for young, new voters.

70. In addition, many would-be voters across the state were unable to submit voter registrations earlier in the pandemic, and many were unable to register with an address that would be reliably maintained through the November election. The Governor extended expiration of state motor vehicle licenses, but state election law does not accommodate voters who registered with expired licenses and then moved residences across county lines.

---

[20] Dylan Smith, *Arizona shutting down online voter registration at spring deadline*, Tuscon Sentinel (Apr. 15, 2020), https://www.tucsonsentinel.com/local/report/041520_az_mvd_voters/arizona-shutting-down-online-voter-registration-spring-deadline/.

10

*The Organizational Plaintiffs Diverted Resources Because of the Impending Voter Registration Cutoff*

71. Plaintiffs diverted significant resources to try register as many voters ahead of the impending Voter Registration Cutoff of October 5.

**MFV**

72. In August, Plaintiff MFV developed and implemented a new health and safety protocol to be able to resume in-person voter registration, including the use of PPE, safety measures and training, and health screening.

73. MFV increased the salary for voter registration workers to be able to staff up and register as many voters as possible ahead of the Voter Registration Cutoff.

74. In order to minimize COVID-19-related health absences of its workers so as to maximize the number of voters MFV could register ahead of the October 5 deadline, MFV also had to divert additional money and resources to find and purchase PPE and equip all its voter registration employees with PPE; develop and train them in a new COVID-19 safety protocol for in-person registration; and hire a health inspector to routinely screen all employees participating in voter registration.

75. MFV also diverted resources to reassign staff to try to register as many voters as possible ahead of the deadline.

76. For example, MFV diverted resources to move staff, including plaintiff Ulises Ventura, from its Phoenix office to its Tucson office, which had been closed during the shutdown, in order to ramp back up voter registration efforts there ahead of the Voter Registration Cutoff.

77. MFV also diverted resources away from other work it typically does in voter education in order to prioritize voter registration ahead of the deadline.

**ACFC**

78. ACFC diverted significant resources to move its entire registration effort from in-person to online in order to register voters ahead of the Voter Registration Cutoff.

79. Because many of ACFC's voter registration employees are young people from communities of color, many of them lacked the resources needed to work virtually.

80. ACFC had to divert resources to purchase them Wifi hotspots, cell phones to call and text potential voters, and tablets to help potential voters register online.

81. ACFC also spent money purchasing software to help their employees make calls and send texts to potential voters.

82. ACFC diverted resources to create and run digital advertisements and purchase related software which would allow them to follow up with people who responded to an advertisement and expressed interest in registering to vote.

83. ACFC diverted resources to create and implement a new text-messaging voter registration campaign.

84. ACFC diverted resources to train its volunteers on these new voter registration methods and the supportive technologies. It took time for ACFC's employees and volunteers to learn, adapt, and become comfortable with the new voter registration processes.

85. Since restrictions throughout the state began to loosen in August, ACFC diverted additional resources to develop and host drive-through registration events in church and foodbank parking lots, voter registration mask give-away events at local elementary schools, and drive-in movie voter registration events.

86. During this period, ACFC also increased its spending on digital advertising.

87. ACFC diverted resources to build new employee schedules to be able to create and staff this registration program. This required ACFC to divert employees from other projects into the voter registration work, including changing people's job descriptions, titles, positions, and work hours.

88. In addition to having to divert money, time, and employees, ACFC also had to divert additional time to voter registration. Prior to the pandemic, in a typical six-

hour shift, one voter registration employee would on average register 1.5 new voters every hour; that has now dropped to 0.35 new voters per hour.

89. In order to pay for all of these unprecedented costs and to ensure that ACFC's voter registration efforts moved forward as quickly as possible, in light of the upcoming Voter Registration Cutoff, ACFC had to divert resources to engage in additional, unplanned fundraising; apply for grants from COVID relief funds; and reallocate funds from its other projects.

90. If MFV and ACFC had not diverted these resources to in-person registration ahead of the Voter Registration Cutoff, then they would have frustrated their mission of registering voters.

***Enforcement of the Voter Registration Cutoff Under these Conditions Severely Burdens Plaintiffs' First and Fourteenth Rights to Register Voters***

91. Enforcement of the Voter Registration Cutoff will frustrate Plaintiffs' mission to register as many voters as possible for the 2020 election and thousands of Arizonans will be denied their right to vote.

92. Under the pandemic conditions which have been in effect in Arizona since March 2020, Defendant's enforcement of the Voter Registration Cutoff severely burdens Plaintiffs' right to register voters in time for the election this year.

93. Plaintiffs' redoubled post-shutdown registration efforts are just beginning to bear fruit.

94. For example, since Plaintiff MFV resumed in-person registration work at the end of August, in the last three weeks, it has registered 4,500 additional voters.

95. This rate is similar to the rate of registration MFV had been experiencing prior to the shutdown, *i.e.* approximately 1,523 voters per week.

96. MFV has now registered a total of just under 14,000 voters so far this year.

97. ACFC has registered 9,637 voters so far this year.

13

98. An extension of the Voter Registration Cutoff would allow Plaintiffs to register thousands of new voters before the November election.

***Arizona Can Easily Extend the Voter Registration Cutoff***

99. Any inconvenience the Secretary might experience from an extension of the Voter Registration Cutoff will be minimal due to Arizona's registration and election process.

100. Arizona is already required to process four categories of overseas voter registrations, and domestic registrations timely postmarked by the Voter Registration Cutoff, as late as 7:00 p.m. on election day, belying any claim by the Secretary that Arizona is unable to accept new registrations after October 5.[21]

101. Arizona already allows early voting to begin just *two days* after the Voter Registration Cutoff. Ariz. Rev. Stat. § 16-541.[22] That means that, as a matter of course, Arizonians can register to vote on October 5 and cast their ballot by voting early just two days later on October 7.

---

[21]   *See* Ariz. Rev. Stat. § 16-103(A), (C) (qualified registrants temporarily absent from the state may register by submitting an affidavit to the county recorder up until 7:00 p.m. on election day); *Id.* § 16-103(B), (C) (designated overseas voters, including military servicemembers, federal employees, and their families, may, register to vote via federal postcard application up until 7:00 p.m. on election day); *Id.* § 16-103(E) (U.S. citizens who have never resided in the U.S. and whose parent is a citizen who is registered to vote in Arizona may register using a federal write-in early ballot, as long as it is received by the county recorder by 7:00 p.m. on election day); *Id.* § 16-103(D) (these same designated overseas voters, if discharged from overseas service in the 90 days before election day, may register to vote by 5:00 p.m. on the Friday before election day); *Id.* § 16-134(C)(1) (in case of registration by mail, a registration is valid if "[t]he form is postmarked twenty-nine days or more before an election and is received by the county recorder by 7:00 p.m. on the day of that election.")

[22]   *See*, *e.g.*, Maricopa Cnty. Elections Dep't, *Where Do I Vote?*, https://recorder.maricopa.gov/pollingplace/ (last visited Sept. 30, 2020) (click: "vote centers" for early voting locations); Pima Cnty. Recorder's Office, *Early Voting Sites*, https://www.recorder.pima.gov/EarlyVotingSites (last visited Sept. 30, 2020); Yuma Cnty. Ariz., *Early Voting*, https://www.yumacountyaz.gov/government/recorder/voter-information/early-voting (last visited Sept. 30, 2020).

14

102. Arizona already allows voters to simultaneously update their voter registration addresses and cast their votes the same day. Ariz. Rev. Stat. § 16-411(b)(5).[23] Arizona already has the capacity to simultaneously update a voter's registration and allow the voter to vote in the same day.

103. Arizona has already implemented the use of electronic poll books which allow for swift and frequent updating with new voter registrations.[24]

104. All 15 Arizona counties subscribe to the Electronic Registration Information System ("ERIC"), an interstate system which makes it easier to "register more eligible citizens to vote."

105. For all these reasons, Arizona can extend the Voter Registration Cutoff and any administrative inconvenience will be minimal at worst.

**FIRST CAUSE OF ACTION**
**Severe Burden on the Right to Register Voters**
**in Violation of the First Amendment**
**as Applied During the COVID-19 Pandemic**

106. Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

107. The First Amendment, which is applicable to states via the Fourteenth Amendment, prohibits "abridging the freedom of speech." U.S. Const. Amend. I.

108. The right to vote and the related rights to associate and engage in free speech to register voters and get out the vote are core political rights protected by the First Amendment.

---

[23] See, e.g., Pima Cnty. Recorder's Office, *Provisional Voter FAQ*, https://www.recorder.pima.gov/faq_voter_provisional (last visited Sept. 30, 2020) (noting that a voter can vote in person and then use a provisional ballot form to update their voter registration record with a new residence address).

[24] See Nat'l Conference of State Legislatures, *Electronic Poll Books | e-Poll Books* (Oct. 25, 2019), https://www.ncsl.org/research/elections-and-campaigns/electronic-pollbooks.aspx (noting that Ariz. Rev. Stat. Ann. §§ 16-571, 16-444 authorize the use of e-poll books).

15

109. As applied during the ongoing COVID-19 emergency, Arizona's October 5 Voter Registration Cutoff severely burdens Plaintiffs' ability to exercise core political speech and associational rights in voter registration drives in violation of the First Amendment.

110. Arizona's interest enforcing the Voter Registration Cutoff is not narrowly tailored nor sufficiently compelling to justify the severe burden imposed on Plaintiffs' First Amendment rights.

111. Without an order enjoining Defendant from enforcing the Voter Registration Cutoff and extending the deadline, Plaintiffs will be subject to an unjustifiable burden on their First Amendment rights and will suffer irreparable harm for which there is no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**Severe Burden on the Right to Register Voters**
**in Violation of the Due Process Clause of the Fourteenth Amendment**
**as Applied During the COVID-19 Pandemic**

112. Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

113. The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution provides that "[n]o States shall . . . deprive any person of life, liberty or property, without due process of the law." U.S. Const. Amend. XIV § 1.

114. The right to vote and the related rights to associate and engage in free speech to register voters and get out the vote are core political rights protected by the Due Process Clause of the Fourteenth Amendment.

115. As applied during the ongoing COVID-19 emergency, Arizona's October 5 Voter Registration Cutoff severely burdens Plaintiffs' ability to exercise core political speech and associational rights in voter registration drives in violation of the Due Process Clause of the Fourteenth Amendment.

116. Arizona's interest in enforcing the Voter Registration Cutoff is not narrowly tailored nor sufficiently compelling to justify the severe burden imposed on Plaintiffs' Fourteenth Amendment rights.

117. Without an order enjoining Defendant from enforcing the Voter Registration Cutoff and extending the deadline, Plaintiffs will be subject to an unjustifiable burden on their Fourteenth Amendment rights and will suffer irreparable harm for which there is no adequate remedy at law.

**THIRD CAUSE OF ACTION**
**Declaratory Judgment**
**(Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201–02)**

118. Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

119. A justiciable case and controversy exists because Defendant's enforcement of the Voter Registration Cutoff under the pandemic conditions in effect in Arizona imminently threaten to severely burden Plaintiffs' First and Fourteenth Amendment rights to register voters in time for the November 2020 election.

120. Plaintiffs are entitled to a declaratory judgment that Defendant's enforcement of the Voter Registration Cutoff as applied here under the pandemic conditions in Arizona is unconstitutional.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

Preliminarily and permanently enjoin Defendant from enforcing the Voter Registration Cutoff this election cycle;

    a. Order Defendant to extend the Voter Registration Cutoff to a date no earlier than October 27, 2020;

    b. Declare that enforcement of the Voter Registration Cutoff as applied under the pandemic conditions in Arizona is unconstitutional in violation of the First and Fourteenth Amendments;

    c. Award Plaintiffs reasonable attorneys' fees and costs;

17

      d.    Retain jurisdiction to ensure Defendant's ongoing compliance with the foregoing orders; and

      e.    Grant such other and further relief that this Court deems just and appropriate.

DATED this 30th day of September, 2020.

              EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP

              By  s/ Zoe Salzman

                  Matthew D. Brinckerhoff
                  Jonathan S. Abady
                  Zoe Salzman
                  Nick Bourland

OSBORN MALEDON, P.A.

                  Mary R. O'Grady
                  Joshua D. Bendor

FREE SPEECH FOR PEOPLE

                  John Bonifaz
                  Gillian Cassel-Stiga
                  Ben Clements
                  Ronald Fein

*Attorneys for Plaintiffs*