

649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003
(602) 382-4078

Kory Langhofer, Ariz. Bar No. 024722
kory@statecraftlaw.com
Thomas Basile, Ariz. Bar. No. 031150
tom@statecraftlaw.com

*Attorneys for Proposed Intervenors Republican National Committee and National Republican Senatorial Committee*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Katie Hobbs, in her official capacity as the Arizona Secretary of State,<br><br>Defendant,<br><br>Republican National Committee and the National Republican Senatorial Committee, federal political committees,<br><br>Intervenors. | No. 2:20-cv-01903-SPL<br><br>**[PROPOSED] INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

It has never been easier to register to vote in the State of Arizona. Individuals wishing to engage in this function of citizenship may do so by completing a simple, one-page form, which may be submitted either on paper or online, 24 hours a day, seven days a week. To further facilitate easy and expeditious registrations, the Secretary of State has long maintained a toll-free telephone hotline for those encountering questions or potential impediments in the registration process. Perhaps most importantly in this era of public health exigencies, physical contact is not a prerequisite to attaining qualified elector status in Arizona; any individual possessing a computer, smartphone or a postage stamp may register to vote in a matter of minutes without leaving her home or risking exposure to COVID-19 pathogens. The Arizona Legislature has qualified this extraordinarily accommodating and adaptable regime with only one material caveat: registrations must be submitted to the County Recorder no later than twenty-nine days prior to the election—a deadline that helpfully coincides with the twenty-nine day durational residency requirement for voting in Arizona. *See* Ariz. Rev. Stat. §§ 16-101(A)(3), -120(A).

Public confidence in the integrity of elections and the impartiality of their administration is constructed on the cornerstones of uniformity, consistency, and predictability. In effectively nullifying Arizona's statutory voter registration deadline at the eleventh hour, the injunction sought by the Plaintiffs—who will sustain no remediable "injury" (let alone "severe burden") by operation of the registration deadline—would upend a reasonable, neutral and non-discriminatory safeguard that is integral to the orderly and sound administration of the November 3, 2020 general election. The Court accordingly should deny the Plaintiffs' Motion in its entirety.

**I.      This Action is Untimely**

    **A.      *Purcell* Forecloses the Last-Minute Changes to Election Rules**

Deadlines governing the political process are not banausic devices that can be swept aside when convenient; they are vital and interdependent components of an electoral infrastructure designed to ensure the integrity of the voter rolls and the reliability of election results. For this reason, the Supreme Court has long cautioned against eleventh hour

judicial tinkering with such parameters, recognizing "voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006); *see also Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018) ("[T]he Supreme Court has warned us many times to tread carefully where preliminary relief would disrupt a state voting system on the eve of an election."). Two recent cases arising from this jurisdiction are illustrative. In October 2016, Arizona Democratic Party organizations asked this Court to extend by one day the state's voter registration deadline to remediate alleged confusion resulting from the legal effect of the Columbus Day holiday. This Court declined, explaining, in words that resound in this case:

> 'There is no doubt that the right to vote is fundamental, but federal court cannot lightly interfere with or enjoin a state election.' . . . Because this action was initiated in the weeks shortly before the election, administering the relief sought by the Committees, as previously addressed, would have the effect of encumbering the election. Thus, even though the Committees may prevail on the merits of some of their claims, because issuing an injunction on the eve of an election itself would cause harm, relief should be precluded."

*Arizona Democratic Party v. Reagan*, CV-16-03618-PHX-SPL, 2016 WL 6523427, at *17-*18 (D. Ariz. Nov. 3, 2016) (internal citations omitted)).

The day before this Court issued its opinion in *Arizona Democratic Party*, the Ninth Circuit enjoined enforcement of an Arizona statute prohibiting "ballot harvesting" (*i.e.*, the collection and submission of ballots by third parties other than the voter or those bearing certain specific relationships to the voter). *See Feldman v. Ariz. Sec'y of State's Office*, 841 F.3d 791 (9th Cir. 2016). The U.S. Supreme Court, however, temporarily stayed the Ninth Circuit's judgment in an order that did not expressly cite *Purcell*, but appeared animated by its preoccupation with preserving the legal status quo during the pendency of an election. *See* 147 S. Ct. 446 (2016); *see also Mecinas v. Hobbs*, CV-19-05547-PHX-DJH, 2020 WL 3472552, at *4 (D. Ariz. June 25, 2020) ("Although election cases are not exempt from traditional stay standards, courts must nonetheless take careful account of considerations specific to state election cases."); *Common Cause v. Thomsen*, 19-CV-323-JDP, 2020 WL 5665475, at *2 (W.D. Wis. Sept. 23, 2020) ("The important question under *Purcell* isn't

whether a decision would favor plaintiffs or defendants; it is whether a decision could lead to confusion before an election. I conclude that *Purcell* counsels in favor of staying the decision on the merits of plaintiffs' case" relating to application of voter identification law).

Nor has the unique constellation of circumstances produced by the COVID-19 pandemic enervated the *Purcell* principle or excused its application. To the contrary, the Supreme Court just months ago again "emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election," in staying an order that would have permitted absentee ballots cast in Wisconsin's primary election to be mailed or postmarked after election day. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020); *see also Texas All. for Retired Americans v. Hughs*, 2020 WL 5816887, at *2 (5th Cir. Sept. 30, 2020) (staying district court order enjoining statute that eliminated straight-ticket voting, reasoning that "the injunction openly defies the Supreme Court's instruction . . . not to interfere with state election laws on the eve of an election"); *Clark v. Edwards*, -- F. Supp. 3d --, 2020 WL 3415376, at *5 (M.D. La. Jun. 22, 2020) (invoking *Purcell* in rejecting challenge to statutory limitations on absentee voting).

This case personifies precisely the concerns that underpinned *Purcell* and *RNC*. Waiting until just three business days until the close of voter registration to bring their claims, the Plaintiffs now demand that Arizona elections officials abruptly and hastily restructure their operational processes to divert vital resources away from ballot distribution, processing and tallying in order to accommodate the Plaintiffs' private organizational preferences and priorities.

If this request were granted, disorderliness may pervade the voting period. Registrants may indicate on the voter registration form whether they wish to be placed on the permanent early voting list. If the registration deadline is extended, there is a substantial danger that at least some late registrants who elect this option will not receive an early ballot prior to Election Day. Conversely, late PEVL registrants whose registrations are processed and who are issued an early ballot—but who nevertheless mistakenly believe they must appear at the polling place on Election Day—must cast a provisional ballot, *see* Ariz. Rev.

Stat. §§ 16-579(B), -584, a complication that is likely to only compound the confusion.

The specter of voter confusion is also palpable. The Secretary of State and the County Recorders have—via their websites and official publications—for months informed the public that those wishing to register to vote must do so no later than October 5, 2020. If the Plaintiffs' requested injunction issues, prospective voters will be inundated with messaging from various activists and interest groups that, on its face, directly contradicts what these individuals have been told by their elected officials. Such informational discrepancies at the crest of a tumultuous election season is plainly conducive to public mistrust. *See Rangel-Lopez v. Cox*, 344 F. Supp. 3d 1285, 1290 (D. Kan. 2018) (declining request to order relocation of polling place, noting that elections officials had already notified voters of the polling location "by letter and through the media" and that a last-minute alteration "likely would create more voter confusion than it might cure").

In short, the confluence of the Plaintiffs' dilatoriness, the disruption the requested relief portends for the efficient administration of the impending election, and the precipitation of confusion and uncertainty among the electorate militate strongly in favor of denying the Motion. See *Yazzie v. Hobbs*, CV-20-08222-PCT-GMS, 2020 WL 5834757, at *4 n.2 (D. Ariz. Sept. 25, 2020) (citing *Purcell* in concluding that request to extend ballot receipt deadline for certain voters "will cause voter confusion . . . complicate ballot processing, and clash with the mandated timelines for other election laws").

### B. The Plaintiffs' Claims Are Barred by Laches

"Laches—unreasonable and prejudicial delay—requires denial of injunctive relief, including preliminary relief." *Arizona Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 922 (D. Ariz. 2016) (internal quotation omitted). A close conceptual and doctrinal cousin of the *Purcell* principle, laches is not confined to the election context but is imbued with particular salience in this setting. *See Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) ("In the context of elections . . . any claim against a state electoral procedure must be expressed expeditiously. As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made.").

4

1    Although the pandemic-induced circumstances that Plaintiffs allege were the
2    impetus for their claims crystallized in March, Plaintiffs inexplicably tarried for nearly
3    seven months—until three days before the registration deadline—to commence this action.
4    Plaintiffs' purportedly newfound realization that a judicially crafted extension may assist
5    their campaign is not a satisfactory excuse, particularly when the Plaintiffs' own
6    declarations acknowledge restarting their registration activities in August. *See* Bravo Decl.
7    ¶ 25; Bolding Decl. ¶ 23.  The putative burdens arising from the October 5 deadline should
8    have been clear to the Plaintiffs by then, leaving unanswered the question of why Plaintiffs
9    waited more than a month—which is a considerable interval in the highly compressed
10   context of an election season—before bringing this action. *See Ariz. Pub. Integrity Alliance*
11   *v. Bennett*, CV-14-01044-PHX-NVW, 2014 WL 3715130, at *2-3 (D. Ariz. Jun. 23, 2014)
12   (finding unreasonable delay where plaintiffs "began looking seriously at" potential action
13   months before filing suit shortly before deadline, adding that plaintiffs would not have
14   needed to amass all necessary documentary evidence before filing a complaint); *Ariz.*
15   *Democratic Party*, 2016 WL 6523427, at *17 ("Their efforts also do not explain why the
16   Committees did not file a complaint prior to the [voter] registration deadline at the end of
17   September, when the likelihood that they could persuade the counties or the Secretary to
18   extend the deadline became clearly doubtful, if not surely foreclosed. Instead, their efforts
19   only demonstrate that the Committees knew the basis of their claims in advance of the voter
20   registration deadline and had ample opportunity to seek relief before it passed.").

21   The prejudice produced by the Plaintiffs' unreasonable delay is multifaceted.  First,
22   as indicated in the Motion to Intervene, an extension of the voter registration deadline will
23   force a last-minute and burdensome reallocation of Intervenors' funds and manpower to
24   restart their voter registration efforts in Arizona. *See* Motion to Intervene at 6.  Second, the
25   requested injunction will inflict disruptions and dislocations in the County Recorders'
26   already herculean task of disseminating, processing and tallying millions of early ballots,
27   as well as preparing for Election Day operations at hundreds of polling locations statewide.
28   Finally, "[b]y waiting until the last minute to bring their challenge, the [Plaintiffs] 'place[ed]

the court in a position of having to steamroll through the delicate legal issues.' This 'strains the quality of decision making and is ultimately unfair to all involved.'" *Arizona Democratic Party*, 2016 WL 6523427, at *17 (internal citations omitted). Had the Plaintiffs acted expeditiously, their request for injunctive relief "could have been briefed and decided without unreasonable burden on the Secretary, the Court, or the voters and the election process." *Id.*; *see also Arizona Libertarian Party*, 189 F. Supp. 3d at 924 (finding prejudice in election case, reasoning that "Plaintiffs' delay has prejudiced the administration of justice. Plaintiffs' delay left the Court with only 18 days before the petition-submission deadline to obtain briefing, hold a hearing, evaluate the relevant constitutional law, rule on Plaintiffs' motion, and advise the Secretary and the candidates which statutory petition requirement applies").

## II. Plaintiffs Failed to Join the Necessary Parties

The Plaintiffs sued the wrong party. Katie Hobbs periodically revises the Elections Procedures Manual with input and approval from the Arizona Attorney General and the Governor, *see* A.R.S. § 16-452, but she does not presently control or direct statewide voter registration for the 2020 general election. Instead, Arizona law entrusts that function to 15 duly elected County Recorders. *See id.* § 16-131, *et seq.* Because the Plaintiffs failed to join the County Recorders, this Court lacks personal jurisdiction over the necessary parties and cannot grant the requested relief. *See* Fed. R. Civ. P. 19(a)(1)(A).

## III. Plaintiffs Lack Standing to Pursue Their Claims

The judicial power cannot be enlisted to vindicate policy preferences. Rather, it exists only to resolve discrete "cases" and "controversies," *see* U.S. Const. art. III, that are reified in concrete and remediable legal injuries. "Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975) (standing "is the threshold question in every federal case, determining the power of the court to entertain the suit").

To this end, a plaintiff must establish not only the existence of an articulable "injury" but—just as importantly—that the harm is "fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  Notably, Plaintiffs do **not** allege that any given individual who wishes to register to vote is unable to do so as a result of the registration deadline or COVID-related circumstances.  Nor could they, because voter registration in Arizona is easily and freely available to all interested and qualified individuals.  Voter registration entails no physical contact or even direct interaction with any third party; an individual may register online or simply drop a completed paper form in the mailbox at her convenience.  Rather, the crux of Plaintiffs' theory of standing is that they "have diverted significant resources to try to register as many voters as possible ahead of the Voter Registration Cutoff notwithstanding the pandemic restrictions." Compl. ¶ 8.

The Intervenors agree that a diversion of resources impelled by a governmental action or practice is a cognizable injury that can sustain organizational standing.  Even assuming that Plaintiffs have incurred such an "injury," however, they have proffered no facts indicating that it is traceable to any statute or regulatory edict, or that the prospective relief they seek could redress the ostensible harm.

### A.   Plaintiffs' Injury is Not Attributable to Any State Action

Plaintiffs' inability to delineate any plausible causal nexus between their organizational injury (*i.e.*, their previous expenditures of organizational resources) and enforcement of the voter-registration deadline extinguishes any claim of standing. Despite the Plaintiffs' intimations to the contrary, *see* Compl. ¶ 41, the so-called "stay at home" order issued by Governor Ducey on March 30, 2020 did **not** prohibit or restrict voter registration efforts; to the contrary, it affirmatively exempted "Essential Activities," a term defined to explicitly include "[e]ngaging in constitutionally protected activities such as speech and religion, and any legal or court process provided that such is conducted in a manner that provides appropriate physical distancing to the extent feasible." Executive

7

Order 2020-18, ¶ 4(f), *available at* https://azgovernor.gov/file/34365/download?token=6YdWos-F; *see also Thompson v. DeWine*, 959 F.3d 804, 809 (6th Cir. 2020) (Ohio plaintiffs unlikely to succeed on merits of claims that petition filing deadline and signature thresholds burdened their constitutional rights, in part because the state "specifically exempted conduct protected by the First Amendment from its stay-at-home orders").

Further, the Plaintiffs conspicuously elide a pivotal distinction between the effects of the pandemic and the effects of the statutory registration deadline. Specifically, the Plaintiffs aver that they "had to divert resources in order to ram up our in-person registration work to get people registered ahead of the deadline. That meant we had to purchase PPE equipment, buy cleaning supplies, develop new health and safety protocols, train staff to follow those protocols, and hire safety control staff to make sure those protocols were being followed," as well as bolster staffing on their voter registration program. Bravo Decl. ¶¶ 26, 29-30. Even assuming that these exertions are "injuries," however, nothing in the Complaint or supporting declarations permits an inference that they are attributable to the October 5 registration deadline. In other words, Plaintiffs have never alleged, nor furnished any reason to believe, that any putative diversion of resources would have been diminished had the registration deadline been, say, October 27 (or, alternatively, November 3). In other words, the injury posited by the Plaintiffs is "squarely traceable to the global pandemic, not to the actions of Defendants." *Clark*, 2020 WL 3415376, at *13 ("Injury does not arise because of [plaintiffs'] desire or preference for a different scheme of absentee by mail voting, nor because they adjust their organization's activities in response to the Virus and the Virus-related changes to the law.").

**B.     Prospective Injunctive Relief Cannot Remedy the Plaintiffs' Past Diversion of Organizational Resources**

Even if the Plaintiffs' purported injuries could be attributed to the statutory voter registration deadlines, they cannot be redressed through injunctive remedies. "[A] plaintiff who seeks prospective injunctive relief cannot establish standing based on past harm alone. Even if a plaintiff has suffered past harm from the kind of conduct the suit seeks to enjoin,

8

the plaintiff must 'establish a real and immediate threat' that the harm-producing conduct will recur. *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1280 (D.C. Cir. 2012) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 105 (1983)). In this vein, Plaintiffs recitation of their financial and logistical exertions over the preceding weeks and months are a *non-sequitur*; the operative question—which Plaintiffs are at a loss to answer—is how the ***absence*** of an injunction will compel them to divert organizational resources ***in the future***. Indeed, if anything, it appears that the entry of the injunction will cause Plaintiffs to expend even greater sums than they otherwise would if registration closes on October 5. In sum, even assuming that Plaintiffs' "expenditures 'perceptibly impaired' these organizations' activities, they at best demonstrate *past* injury. Such injury might admit standing to sue for compensatory damages. But it is not an injury that can be redressed through the prospective declaratory and injunctive relief sought in this action." *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 388 (2d Cir. 2015) (internal citation omitted); *see also Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020) (organization plaintiffs' past expenditures to "address voting inequities and irregularities" could not sustain standing because the complaint "pleads only backward-looking costs, not the imminent future injury needed to establish standing for declaratory and injunctive relief claims like this one").

### IV. The Statutory Voter Registration Deadline Does Not "Burden" the Plaintiffs' Rights, and Is Necessary to Vindicate the State's Important Interests

#### A. Overview of Standards of Review in the Voting Rights Context

Before parsing the Plaintiffs' allegations of a "burden," it is useful to recount the doctrinal structure in which voting rights claims are evaluated. Broadly speaking, the United States Supreme Court has recognized three variants of constitutional injuries in the voting rights context.

First, a state or locality's denial of the franchise to any citizen residing in the electoral jurisdiction can be sustained only if it the least restrictive means of furthering a compelling governmental interest. *See, e.g.*, *Kramer v. Union Free Sch. Dist.*, 395 U.S. 621 (1969)

9

(invalidating statute that limited right to vote in school board elections to property owners and parents of schoolchildren in the district); *Dunn v. Blumstein*, 405 U.S. 330 (1972) (invalidating requirement that individuals must reside in the state for a year and in the county for three months in order to be eligible to vote); *Evans v. Cornman*, 398 U.S. 419 (1970) (striking down Maryland statute that prohibited residents of a federal enclave within the state from voting in state elections); *Carrington v. Rash*, 380 U.S. 89 (1965) (statute denying the vote to military personnel deemed unconstitutional).

A second type of voting rights claim that likewise triggers strict scrutiny arises out of "regulations that contravene the principle of 'one person, one vote,' by diluting the voting power of some qualified voters within the electoral unit." *Green v. City of Tucson*, 340 F.3d 891, 900 (9th Cir. 2003); *see also Reynolds v. Sims*, 377 U.S. 533, 566 (1964) ("Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment.").

Occupying a third, and considerably more deferential, tier of constitutional review are neutral, generally applicable laws that regulate the manner and method of voting—to include Arizona's voter registration deadline. Governed by the standard first articulated in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and refined in *Burdick v. Takushi*, 504 U.S. 428 (1992), such "reasonable, nondiscriminatory restrictions" are sustained by "the State's important regulatory interests," even if they modestly burden voting rights. *Burdick*, 504 U.S. at 434; *see also Pub. Integrity Alliance v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) ("We have repeatedly upheld as 'not severe' restrictions that are generally applicable, evenhanded, politically neutral, and protect the reliability and integrity of the election process." (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011)).[1] This so-called *Anderson-Burdick* rubric applies irrespective of whether the voting procedure in

---

[1] If the alleged burden on the franchise is "severe"—*i.e.*, it operates as a deprivation or dilution of the right to vote—then the strict scrutiny standard controls. *See Burdick*, 504 U.S. at 434; *Green*, 340 F.3d at 893 (noting that "the Supreme Court has applied strict scrutiny only to voting regulations that prohibit some residents in a given electoral unit from voting, or that dilute the voting powers of some residents in a given electoral unit").

1  dispute is cast as a violation of the plaintiff's equal protection rights, or instead as an
2  infringement on the voter's First Amendment right to associate for political ends. *See*
3  *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012).

### B. Plaintiffs Failed to Allege Any Severe Burden on Voting Rights Attributable to the Registration Deadline or Any Other State Action

The practical difficulties that Plaintiffs miscast as legally cognizable "burdens" derive solely from the vicissitudes of the pandemic and the vagaries of a frenetic election season—not any constitutional defect in Arizona's electoral infrastructure. At least three considerations underscore that the Plaintiffs have incurred no articulable "burden" on their First or Fourteenth Amendment rights.

*First*, the Plaintiffs' allusions to the Governor's "stay-at-home" order obscure the critical fact that in-person voter registration efforts were never curtailed by operation of law in Arizona. To the contrary, the Governor's Executive Order specifically exempted from its restrictions "speech" and other constitutionally protected activities. *See* Executive Order 2020-18, ¶ 4(f). This point is important, if not dispositive. Plaintiffs rely on the Sixth Circuit's relaxation of certain statutory requirements for nomination petitions in *Esshaki v. Whitmer*, 813 Fed. Appx. 170 (6th Cir. 2020). Crucially, however, the same court held that Ohio's COVID-related restrictions—which, like Arizona's, explicitly exempted First Amendment activities, such as petition circulation—did not warrant a judicial suspension of Ohio's in-person signature and deadline requirements for ballot measure petitions. *See Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020); *see also Fair Maps Nevada v. Cegavske*, 320CV00271MMDWGC, 2020 WL 2798018, at *3 (D. Nev. May 29, 2020) (granting relief to ballot measure petition proponents in part because, unlike Arizona, "none of the [stay at home] orders include a carve-out for activities protected by the First Amendment, such as collecting signatures to support a ballot initiative"); *Sinner v. Jaeger*, 3:20-CV-00076, 2020 WL 3244143, at *5 (D.N.D. June 15, 2020) (same conclusion where "[n]one of the Governor's executive orders even tangentially prohibited signature collection"). In other words, neither the Governor nor any other Arizona official has ever

constrained or constricted the Plaintiffs' voter registration efforts.

***Second***, the empirical experience of ballot measure proponents belies the Plaintiffs' contention that in-person registration efforts were effectively thwarted by the stay-at-home order. Notably, more than 420,000 signatures were collected in Arizona in support of the Stop Surprise Billing Act—of which more than 130,000 were gathered in May and June of 2020 alone. *See* Decl. of Zack Alcyone, ¶ 4(a). Experienced petition circulators have also attested that while the pandemic has presented practical obstacles, well-organized field efforts have attained impressive signature collection and voter contact benchmarks. *See* Decl. of Nathan Sproul, ¶¶ 6-8. To allow the requested relief would fundamentally harm the Intervenors, who invested additional time and money to sign-up voters despite the practical difficulties. More fundamentally, the registration deadline is a longstanding fixed premise of Arizona's legal landscape. Voter registrations may be submitted twenty-four hours a day, seven days per week—subject only to the limitation that those wishing to vote in the next election must submit their registration no later than 29 days beforehand. To the extent Plaintiffs chose to defer much of their registration activities until late in the 2020 election cycle, they assumed the risk that intervening and perhaps unforeseeable exigencies—such as the pandemic—could impede their plans. *See Arizonans for Fair Elections v. Hobbs*, CV-20-00658-PHX-DWL, 2020 WL 1905747, at *11 (D. Ariz. Apr. 17, 2020) (rejecting argument that Arizona's in-person signature requirements for ballot measure petitions imposed a "severe burden," noting that "a 'reasonably diligent' committee could have placed its initiative on the November 2020 ballot despite the Title 19 requirements and the COVID outbreaks" and "Plaintiffs' declarations fail to provide any explanation (let alone justification) for why they waited so long to begin organizing and gathering signatures"); *Clark*, 2020 WL 3415376, at *13 ("Injury does not arise because . . . [plaintiffs] adjust their organization's activities in response to the Virus and the Virus-related changes to the law.").

***Third***, neither the available evidence nor common sense can sustain an inference that COVID-related restrictions have prevented any individual who wishes to register to vote

from doing so. Unlike a signature on a ballot measure petition—which must be physically witnessed by a third-party circulator, *see* Ariz. Const. art. IV, pt. 1, § 1—voter registration does not require any physical contact with any person. Blank voter registration forms are available in bulk to organizations or individuals conducting voter registration drives, *see* Ariz. Rev. Stat. § 16-131(E), who in turn may distribute them by any means, including by mail or by leaving them at individuals' front doors. Completed forms may be returned to the County Recorder in-person—but also via mail, and voters desiring to dispense with the paper application altogether can complete the registration process entirely online. *See* Ariz. Rev. Stat. § 16-112(B)(4). Individuals who encounter questions or complications in the process can seek immediate assistance telephonic from the Secretary of State's secure, toll-free voter hotline. Simply put, any individual desiring to register to vote could learn of his rights and complete the process in a matter of minutes, all without ever leaving her home or coming within six feet of another person. *Contrast Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1257 & n.2 (N.D. Fla. 2016) (extending voter registration deadline in light of mass evacuations, closure of county offices, and suspension of postal delivery services). His choice not to avail himself of this opportunity—either because of distractions created by the pandemic, disinterest in the political process, or some other reason—does not beget a cognizable "burden" on the Plaintiffs' rights. *See Mecinas v. Hobbs*, CV-19-05547, 2020 WL 3472552, at *7 (D. Ariz. Jun. 25, 2020) (finding that potential voter choices induced by order of candidates' names on the ballot does not "impose[] a burden on [plaintiffs] personally that is not common to all voters").

In sum, the defect at the heart of the Complaint lies in its conflation of practical effects with constitutional burdens. Even if it were true that COVID-related exigencies have produced some articulable *effect* on voter registration rates, it does not follow that enforcement of the voter-registration deadline triggers a judicially vindicable burden.

**B.     The Voter Registration Deadline Advances Important State Interests**

As discussed above, Plaintiffs have adduced no viable allegations or evidence of any articulable burden, and "absent *any* burden [on the franchise], there is no reason to call on

13

the State to justify its practice." *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 732 n.12 (9th Cir. 2015); *see also Mecinas*, 2020 WL 3472552, at 13.

Even assuming the existence of some imposition on the Plaintiffs' rights, however, the State has important regulatory interests in "correctly register[ing] voters," *Ariz. Libertarian Party*, 798 F.3d at 733, and ensuring the organized and efficient administration of the November election. *See Nader v. Brewer*, 531 F.3d 1028, 1040 (9th Cir. 2008) (deeming "orderly election administration" a "compelling" state interest), easily offset any tenuous burden posited by the Plaintiffs. *See Dudum v. Arntz*, 640 F.3d 1019, 1114 (9th Cir. 2011) ("[W]e emphasize that the City is *not* required to show that its system is narrowly tailored" under *Anderson-Burdick* test."). The voter registration deadline fortifies and advances these interests in at least three distinct respects.

***First***, the directive that registrations must be received no later than 29 days prior to the election is no arbitrary benchmark; it temporally aligns the registration regime with Arizona's separate mandate that individuals must have resided in the State for at least 29 days before being eligible to participate in its elections. *See* Ariz. Rev. Stat. § 16-101(A)(3). The Supreme Court has recognized the constitutionality of such modest durational residency requirement as a condition of voting rights, and the necessity of facilitating preparations for Election Day. *See Marston v. Lewis*, 410 U.S. 679, 681 (1973) (finding that Arizona "demonstrated that the 50-day voter registration cutoff (for election of state and local officials) is necessary to permit preparation of accurate voter lists"). The statutory voter registration deadline thus effectively functions as a mechanism for enforcing the residency requirement. Because registrants are not required to aver on the registration form that they have satisfied the 29-day residency rule, an extension of the registration deadline would leave election officials without any metric to verify that such late registrants are *bona fide* residents. The requested relief would force all the County Recorders immediately to amend or supplement the verbiage on the standard voter registration forms.

***Second***, in contrast to the vast majority of states, Arizona conditions eligibility to vote in state and local elections on the registrant's production of documentary proof of U.S.

citizenship. *See* Ariz. Rev. Stat. § 16-166(F). Although elections officials will attempt, by drawing on motor vehicle division and Social Security Administration records, to independently verify new registrants' citizenship status, *see* Ariz. Elections Procedures Manual (rev. 2019) at p. 22, this process justifies a temporal buffer before Election Day. *See Arizona Green Party v. Reagan*, 838 F.3d 983, 991 (9th Cir. 2016) ("The nested deadlines leading up to the Arizona primary, as well as the tasks that must be accomplished between the primary and general election, reflect an effort by the state to achieve the important goal of orderly elections.").

***Third***, as the Secretary will presumably explain, extending the voter registration deadline into the early voting period—which commences on October 7, *see* Ariz. Rev. Stat. § 16-542(C)—begets substantial risk of errors and confusion. Late registrants who enroll on the Permanent Early Voting List may find themselves waiting for a mail ballot that never arrives. Conversely, those whose registrations are processed in time and who have been designated as PEVL voters may nevertheless appear at the polling place (either because they never actually received an early ballot or because they mistakenly supposed they must cast a vote in person) will be required to vote a provisional ballot, which in turn must be processed by elections officials within 10 days of the election. *See id.* §§ 16-579(B), -584. Even the perception (if not reality) of disarray and uncertainty will inevitably corrode the State's vital interest in maintaining public confidence in the security and reliability of their electoral infrastructure. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 197 (2008) ("While [it] is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance" in the *Burdick* balancing analysis).

## CONCLUSION

For the foregoing reasons, the Court should deny the Plaintiffs' Motion in its entirety.

RESPECTFULLY SUBMITTED this 2nd day of October, 2020.

STATECRAFT PLLC

By: */s/ Thomas Basile*
Kory Langhofer
Thomas Basile
649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003

*Counsel for Proposed Intervenors Republican National Committee and National Republican Senatorial Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2020, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

By: */s/Thomas Basile*
Thomas Basile